**IN THE COURT OF APPEALS OF IOWA**

No. 18-2232
Filed June 17, 2020

**NATALIE KIPP,**
        Plaintiff-Appellant,

**vs.**

**DOUGLAS STANFORD, M.D.,**
        Defendant-Appellee.
_____

        Appeal from the Iowa District Court for Black Hawk County, Kellyann Lekar,

Judge.

        Natalie Kipp appeals the district court order granting Douglas Stanford a

new trial. **AFFIRMED.**

        Pressley Henningsen and Benjamin P. Long of RSH Legal, P.C., Cedar

Rapids, for appellant.

        Jennifer E. Rinden, Robert D. Houghton, and Nancy J. Penner of

Shuttleworth & Ingersoll, Cedar Rapids, for appellee.

        Considered by Vaitheswaran, P.J., and Mullins and Ahlers, JJ.

**AHLERS, Judge.**

In this medical negligence case, Natalie Kipp appeals the district court order granting her doctor, Douglas Stanford, a new trial. In August 2013, Kipp had Stanford perform surgery in an effort to address a medical condition that caused her severe abdominal cramping and pain. Kipp's suit alleged Stanford pushed a medical device too far during the procedure, causing significant injury to her. The jury returned a verdict finding Stanford liable and awarded Kipp damages. Stanford moved for a new trial, and the district court granted the motion, finding certain statements Kipp's attorney made during closing arguments constituted misconduct warranting a new trial. Kipp appeals.

## I. Background

The statements at issue were made by Kipp's counsel during his closing and rebuttal arguments. Near the start of the closing argument, counsel addressed the jury's work and accountability, noting:

> And so what I'm gonna do today is I'm gonna talk with you a little bit about what the evidence has been and what that evidence shows. The one truth about what happened here. And after we talk together about that evidence, we talk about that one truth, then you are gonna be given a job to do. In fact, when you came here last week, summons went out to the community, it seemed kind of random, and you were brought in here out of the community and you were asked to sit in this box and you weren't exactly sure why. But as we've worked here together and talked about this case, I'm not sure that it is so random. I believe you eight people were meant to be here to hear this case. And in exchange for your time, in exchange for your attention, you are given an awesome power. You're given the power to hold accountable. You're given the power to value a substantial loss. You're given the power to be a hero for someone who doesn't have the power herself. And what the judge told you is it's your Constitutional Right to use that power to render a verdict and to do justice.

Soon after, counsel again reminded the jury of its place in the community when addressing the district court's admonition to not discuss the case:

> Soon, you're going to be released from that admonition. You're going to be able to go back and talk with each other about the evidence, about the law that applies. And then when that's done, you're going to be able to go back out into the community, and your friends and your family may ask you, what was this all about? And you will be allowed to talk about it.

Counsel referred to accountability and community again near the end of his closing argument:

> What they're saying is medicine is hard, and our devices go in the belly, and we can't actually see the tip of the device anymore, so don't hold us accountable. Don't make us do things the right way. Don't make us meet the standards of care because we can't see the tip of the tool.
>
> When you apply your common sense, that can't be the standard here in this community. In our communities, doctors are excepted [sic] to do things in a way that is safe, that puts the patient safety first, that avoids known and preventable complications, and that's even when they do their first cut. Because if the defense argument was right, then every person who has that initial cut is at risk of a serious, life-changing injury.

Counsel also evoked a theme of responsibility while telling the jury a personal anecdote:

> We've talked about the evidence together. What are we doing here? When I was 10 years old, I had a birthday party. I had four friends come over to my house. We were playing ball in the front yard, and we didn't intend for it to happen, but the ball went through Mr. and Mrs. Nugent, my neighbor, it went through their yard, their window. We didn't intend for that to happen, but it happened. And being 10, we ran. We took off. We hid. And I would never forget my dad grabbing me by the arm. I could feel his fingertips right up under my armpit. He wasn't hurting me, but he was firm, marched me next door, made me knock on the door, tell them what I had done wrong, and promise to make up for it. That's what it means to take responsibility. I learned that lesson from my dad that day.
>
> Why are we here? Because there's a betrayal in this case. Dr. Stanford was negligent. But beyond that, Dr. Stanford, to this day, refuses to take responsibility.

Defense counsel objected to this statement. After an off-the-record discussion, the district court overruled the objection. Right after resuming his argument, Kipp's counsel stated:

> So now what do we do together about it? Remember, in exchange for your time, for your attention, you're given the power to hold accountable. So we are here now to ask for your help to do exactly that.
>
> This is Instruction Number 13. This talks about the formula for what we do to hold someone accountable for their actions. . . . And so when we come to you and we talk to you about holding Dr. Stanford accountable for his actions, what we're talking about is forcing Dr. Stanford to balance out the harms and the losses that he caused. We don't have a magic wand. We can't ask you to go back in time and make sure this doesn't happen. The only way in our system of justice to balance out those harms of—those harms and losses is to put something on the other side of the scale that evens things out, compensates for what's happened. And in our system of justice, the only thing we can ask you to put on the other side of that scale is money. That's the only justice there is. And so to hold Dr. Stanford accountable for his actions, we need to talk about the amount of money that holds him accountable and balances the harms and losses that he caused.

Throughout the rest of his closing argument, Kipp's counsel made additional statements at issue on appeal:

> So let's talk about those harms and losses. Let's talk about the amount of money that balances those harms and losses so that we can work together on what accountability means, holding Dr. Stanford accountable for the harms and losses he's caused.
>
> . . . .
>
> We have to think about what's the most valuable thing to us. What's the most important things in our lives? And when we value things in our day-to-day life, how do we value things we trade? You give me this item, I give you this in return. They have equivalent value. What would we trade for Natalie's experience? For her pain? For her limitation of function?

Defense counsel objected to plaintiff's counsel's statement, and the district court overruled the objection.

Defense counsel moved for a mistrial after Kipp's closing argument concluded. Defense counsel argued the repeated references to accountability and statements calling the jurors "heroes" and referring to Stanford's actions as a "betrayal" had no other purpose than to "inflame [the jury] and to appeal to a sense of prejudice, almost requesting a punishment against Dr. Stanford." While the district court noted it had "some concerns made in Plaintiff's closing arguments," the court decided to give the jury a curative instruction over granting the motion for mistrial:

> Before we begin with the Defendant's closing argument, I just want to make a few brief comments to you.
>
> First of all, I want to point out to you Instruction Number 1. Maybe you all have your jury instructions still or you left them in the jury room. I will read it to you. Part of Instruction Number 1 indicates that you are to decide all fact questions, and that you are to do so without basing your decisions on generalizations, gut feelings, prejudices, sympathies, stereotype, or biases. To go along with that, Instruction Number 18 instructs you to remember that you are not partisans or advocates, but you are judges. You are judges of the facts and your sole interest is to find the truth and do justice. To the extent that during Plaintiff's closing argument, you may have heard a suggestion that your job here was to be a hero or to tell a story to the community, I'd just remind you that your job here is to be the decider of facts and to do so without bias or prejudice.
>
> To the extent that in the prior closing argument, you may have heard the word betrayal or the power to hold accountable, I would just refer you to Instruction Number 8 in your jury instructions, which is the jury instruction that tells you the three propositions which the Plaintiff must prove in order to hold or find Dr. Stanford negligent in this matter. Negligence is the decision that you're making in this particular case, and I would just refer you to that.
>
> Finally, you may have heard an objection from counsel from the Defendant stated during the course of the first closing argument and the reference was to the Golden Rule. The Golden Rule generally refers to a situation where jurors are asked to put themselves in the place of a party or a victim. I would just remind you, based upon the instructions that I just pointed out to you, that your job is to decide this matter based upon Natalie Kipp's damages and not in references to placing yourself in that position.

Following defense counsel's argument, plaintiff's counsel again made several statements on accountability during rebuttal:

> If you believe the Defendant, in surgeries from here on, complication is a free pass.  If something was a risk and it happened during a surgery, well, I get a free pass.  I can't be held accountable.
> . . . .
> And so it is about accountability.  It is about responsibility.  You have to be able to own your mistakes.  And that's why we're here.
> . . . .
> And I want to talk to you a little bit about that instruction that talks about the Social Security because what they're really talking about is that she gets this 700, 750 bucks a month; therefore, don't make the guy that caused the problem pay for everything.  Make the taxpayers do it, and that's not right.  That's a shifting of accountability. And they didn't—they did not provide you any evidence, any witness, any testimony whatsoever.

Plaintiff's counsel continued to refer to accountability while discussing the standard of care, medical expert testimony, and the credibility of witnesses heard during trial:

> You know, folks, there really are two standards of care being proposed to you. One protects the patient, and does in fact put patient safety first.  One protects the doctor when they don't follow rule number one, patient safety.  What they do instead is they get a doctor from the community, they circle up the wagons, and I think Dr. Rozeboom said it best, well, I'm up here testifying because, gosh, forbid someone ever tries to hold me accountable in this community.
> . . . .
> Imagine if you standardized their standard of care.  You standardize it.  You told this community that this is what should happen in a surgery.  That a known risk that everybody knows about, when you do a surgery, when you go into a space and an area you have no business being in that can kill somebody—Dr. Rozeboom spent a long time talking about how fatal this injury can be.  It's okay.  It's okay.  That's within the standard of care.  Going too shallow's within the standard of care.  Going too deep's within the standard of care.  Being in the right spot's within the standard of care.  It's a meaningless standard.

The last remark at issue on appeal was made at the end of the rebuttal argument:

They want you to approve what happened here. That's what your verdict would be if you agree with them. It approves it. It's a stamp of approval. Reminds me of two birds. One is an ostrich with its head in the sand which explains why we're here. They will not listen. Their head is in the sand. And the other bird is a story, a story told to me by somebody else, but it always stuck with me and I think it's an important story, and it applies here. There was a wise man and there was a smart student, but he was also a smart aleck. He always wanted to be right. He never made mistakes. The wise man would always be able to catch him in his lies, catch him in his stories, his problems. So the kid thought, I'm gonna get this wise man this time. I'm gonna capture a bird and I'm gonna put it in my hand, and I'm gonna go up to the wise man and I'm gonna ask him, I've got a bird in my hand, is it alive or is it dead? And no matter what he says, I can trick him, because if he says it's alive, I'm gonna crush it, and I'm gonna show him that it's dead. And if he says that it's dead, I'm gonna open my hands and it will fly away, and I will finally be right. I'm gonna trick the wise man. So he captured the bird and he put it in his hand, and he walked up to the wise man, and he said, I have a bird in my hand, is it alive or is it dead? And the wise man said, I don't know. The bird is in your hand. And Natalie Kipp is now in your hands.

Defense counsel renewed his motion for mistrial after the jury began deliberating. The motion was denied, although the district court preserved Stanford's right to file a motion for new trial or other post-trial motions needed to respond to the statements made in closing arguments. The jury found Stanford had been negligent while operating on Kipp and awarded Kipp damages.

Stanford filed a motion for new trial. Following a hearing on the motion, the district court granted Stanford a new trial. The court determined the two stories told by plaintiff's counsel during closing arguments improperly focused the jury on emotions over facts and logic:

> The story recounted by counsel for the Plaintiff concerning a broken window and being taken by his father to notify the neighbor because it was the right and responsible thing to do followed by the use of the word betrayal improperly focused the jury on the emotion of a young boy doing the right and moral thing in comparison to the alleged betrayal of the Defendant rather than on the law and fact of

the issue of liability. Similarly, the story told at the conclusion of the rebuttal closing argument, about a young boy who is a trickster who is always getting caught by a wise man and who devises a plan to trick the old man while holding the life of a bird in his hand inserts improper emotion and inflames the passions of the jury. Again, this story focuses the emotion of the jury on the concept of someone who is trying to trick or manipulate another person to whom he should be showing respect.

The district court also found plaintiff's counsel's repeated references to accountability, Stanford's "betrayal," and statements about the community to be similarly prejudicial:

> The court recognizes that during portions of the original closing argument made by Plaintiff's counsel, the language used by counsel was in line with the jury instructions and the concepts of negligence, causation and compensatory damages. However, these arguments were overshadowed by the other pervasive arguments by Plaintiff's counsel urging the jury to use their power to set a standard for the community, to be a hero for the Plaintiff, render a verdict that the community could feel protected by, to make the Defendant own his mistakes and to look more harshly on the Defendant for not admitting negligence, and to hold the Defendant accountable and responsible for his "betrayal."

The court concluded plaintiff's counsel's statements were misconduct under Iowa Rule of Civil Procedure 1.1004 and ordered a new trial. Kipp appeals.

## II. Standard of Review

"Our review of rulings on a motion for new trial depends on the grounds asserted in the motion." *Fry v. Blauvelt*, 818 N.W.2d 123, 128 (Iowa 2012) (quoting *Estate of Long ex rel. Smith v. Broadlawns Med. Ctr.*, 656 N.W.2d 71, 88 (Iowa 2002), *abrogated on other grounds by Thompson v. Kaczinski*, 774 N.W.2d 829, 836 (Iowa 2009)). "If the motion and ruling are based on a discretionary ground, such as attorney misconduct, we review for an abuse of discretion." *Rosenberger Enters., Inc. v. Ins. Serv. Corp. of Iowa*, 541 N.W.2d 904, 906 (Iowa Ct. App. 1995).

"A district court abuses its discretion when it 'exercises its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable.'" *First Am. Bank v. Fobian Farms, Inc.*, 906 N.W.2d 736, 744 (Iowa 2018) (quoting *Rowedder v. Anderson*, 814 N.W.2d 585, 589 (Iowa 2012)).

## III. Discussion

### a. Error Preservation

The first issue we must address is error preservation. Kipp argues Stanford's two objections during closing arguments and two motions for mistrial after plaintiff's counsel's closing argument and after rebuttal could not preserve his motion for new trial because defense counsel did not object at all during the rebuttal argument, and his motion for mistrial after the case was submitted to the jury was untimely because it was submitted after the jury had begun deliberating.

"When an improper remark is made by counsel in the course of jury argument, it is the duty of the party aggrieved to timely voice objection." *Andrews v. Struble*, 178 N.W.2d 391, 401 (Iowa 1970). "However, a party does not necessarily waive an objection to a remark made in a closing argument if the party fails to make a contemporaneous objection." *Kinseth v. Weil-McLain*, 913 N.W.2d 55, 67 (Iowa 2018). A party is not required "to make numerous, contemporaneous objections during closing arguments." *Id.* at 67–68. Instead, when a party objects with sufficient time for the district court to "weigh the prejudicial nature of the statements and determine how best to proceed," the court will consider the objection timely and error preserved. *Id.* at 68. A motion for mistrial must come before the case is submitted to the jury to be timely. *Id.* at 67.

Here, the record shows the district court considered the statements made during closing and rebuttal arguments and the propriety of granting a mistrial after closing arguments. Defense counsel made the second motion for mistrial right after the case was submitted. The district court did not directly overrule the second motion for mistrial made at the close of Kipp's rebuttal closing argument. Instead, the court heard the arguments of counsel, noted the jury had just been released to deliberate, and intended to receive the verdict of the jury while preserving Stanford's right to file a motion for new trial on the grounds asserted in the motion for mistrial and any other applicable grounds. Under these circumstances, error was preserved. Our court has concluded similar post-submission motions for mistrial are sufficient to preserve error. *See Rosenberger Enters.*, 541 N.W.2d at 907 (concluding the plaintiff preserved error when the court requested counsel not make a motion for mistrial until after the case was submitted and counsel noted on record that he intended to move for mistrial).

### b. Improper Arguments

"To warrant a new trial based on attorney misconduct, the complained of misconduct 'must have been prejudicial to the interest of the complaining party.'" *Kinseth*, 913 N.W.2d at 67 (quoting *Mays v. C. Mac Chambers Co.*, 490 N.W.2d 800, 803 (Iowa 1992)). "However, unless a different result would have been probable in the absence of misconduct, a new trial is not warranted." *Loehr*, 806 N.W.2d at 277.

"[T]he district court has a broad but not unlimited discretion in determining whether the verdict effectuates substantial justice between the parties." Iowa R. App. P. 6.903(c); *see also Mays*, 490 N.W.2d at 803 ("[T]he trial court has before

it the whole scene, the action and incidents of the trial as they occur, and is in a much better position to judge whether the defendant has been prejudiced by misconduct of opposing counsel, if there is such." (quoting *Baysinger v. Haney*, 155 N.W.2d 496, 499 (Iowa 1968)).  And "[t]he court is slower to interfere with the grant of a new trial than with its denial."  Iowa R. App. P. 6.903(d).

The district court granted Stanford's motion for new trial based on the statements quoted above, which the district court concluded prejudiced the jury when considered in their entirety.  We must first consider whether the statements were misconduct.

Before embarking on a discussion of the specific statements, we will first address the invitation made in Kipp's brief to address each of the arguments claimed to be improper to provide guidance on retrial or in future cases.  While we recognize the potential benefits of such an approach, we also recognize the difficulty in addressing the propriety of each argument in isolation.  Assessing the propriety of arguments is inherently contextual and case-specific.  A comment or argument made one time may or may not be proper in one case, which would shed little light on whether a similar comment or argument would be proper in a different case or if repeated in either case.  While we will endeavor to address all arguments at issue, we necessarily consider them in the context of the closing arguments as a whole and recognize the district court was in a much better position than we are in assessing the impact on the jurors and the trial.  This is why the district court is given broad discretion in ruling on the motion for a new trial.  *See Mays*, 490 N.W.2d at 803.

Turning to the arguments at issue, the first category of alleged improper statements is Kipp's counsel's repeated references to accountability. The district court found these references "conveyed a different meaning or theme than the legal concept of negligence and suggested to the jury a punitive or moralistic consideration of the potential liability of the Defendant." Kipp counters that "accountability" is synonymous with "liability," and it was permissible for counsel to adopt "accountability" as a term for the concept of negligence and liability. While Kipp's claim of the two terms being synonyms may be technically true, we find no abuse of the district court's discretion in finding the manner in which counsel repeatedly referenced accountability suggested the term meant something other than legal negligence. Plaintiff's counsel began his closing argument by telling the jurors they held an "awesome power" that included the power to hold Stanford accountable for Kipp's injuries. Counsel then explained that "awesome power" also included the power "to be a hero." While we express no opinion on whether it is proper to suggest jurors are heroes by performing their civic duties in general, we note the reference in this case suggested the jurors were only heroes if they found in favor of Kipp. It was not an abuse of discretion for the district court to conclude playing on the jurors' notions of pride of being a hero only if they found in favor of Kipp was improper.

The district court also concluded counsel's characterization of the case as a "betrayal" and statements suggesting Stanford needed to admit to a mistake were improper personal opinions. We find no abuse of discretion in this conclusion. It was not an abuse of discretion to conclude that referring to Stanford's actions as a "betrayal" improperly focused the jury's attention on the

moral quality of Stanford's alleged misconduct and suggested Stanford had been dishonest or deceitful.[1]

Similarly, it was not an abuse of discretion for the district court to conclude the first story improperly focused the jury's attention on taking responsibility for one's actions and admitting mistakes, or the second story improperly equated Stanford to a scheming child. We are not suggesting attorneys are not allowed to tell stories as part of closing argument. But those stories cannot convey an improper theme or argument, as counsel is not given immunity from improper argument by embedding the argument in a story. The district court did not abuse its discretion in finding it improper for counsel to utilize the theme of "betrayal" or utilize these particular stories to characterize the opposing party as scheming or dishonorable, as "[c]ounsel has no right to create evidence by his or her arguments, nor may counsel interject personal beliefs into argument." *Rosenberger Enters.*, 541 N.W.2d at 908. And "[s]uch melodramatic argument does not help the jury decide their case but instead taints their perception to one focused on emotion rather than law and fact." *Id.*

Another category of statements at issue is counsel's references to the community and to the social consequences of the jury's decision. Throughout closing and rebuttal arguments, counsel tied aspects of the case back to the community and the jury's place in it, including framing the jury's decision as

---

[1] "Betrayal" is defined as "1: the act of betraying someone or something or the fact of being betrayed : violation of a person's trust or confidence, of a moral standard, etc.; 2: revelation of something hidden or secret." *Betrayal*, Merriam-Webster, https://www.merriam-webster.com/dictionary/betrayal (last visited May 12, 2020). Included as synonyms are the terms "backstabbing, disloyalty, double cross, falseness, falsity, treachery." *Id.*

something about which they will be asked by members of the community after the case ends and telling the jury the defense's position "can't be the standard here in this community." We find no abuse of discretion in the district court's conclusion such statements improperly urged the jury to focus on the greater societal impact and context of their decision and the reaction the community will have to the jury's decision, rather than focusing the jury's attention on the facts before it. *See Conn v. Alfstad*, No. 10-1171, 2011 WL 1566005, at *6 (Iowa Ct. App. Apr. 27, 2011) (concluding counsel's statement during closing arguments informing the jury that "the world is watching them and everyone around the state is watching them" was improper); *State v. Johnson*, 534 N.W.2d 118, 128 (Iowa Ct. App. 1995) ("The prosecutor's comments improperly urge the jurors to convict the defendant in order to protect community values and prevent further criminal activity. They were an improper emotional appeal designed to persuade the jury to decide the case on issues other than the facts before it.").

The final category of statements includes plaintiff's counsel's statements asking the jury "We have to think about what's the most valuable thing to us. . . . What would we trade for Natalie's experience?" and the statement about social security benefits,[2] both of which the district court weighed when assessing the

---

[2] An issue was also raised about Kipp's counsel's reference to a jury instruction regarding social security benefits. The district court's ruling on the motion for new trial did not explain how the court arrived at the conclusion this argument was improper and cited no authority in support of that conclusion but did note the argument could not be characterized as an attack on the instruction given by the court, as suggested by the defense. Stanford's brief suggests no impropriety in this argument other than the claim that it suggested the jury could disregard the court's instruction. Since the district court cited no authority for its conclusion the argument was improper and disagreed with the defense claim the argument was

cumulative effect of counsel's improper statements.  The district court concluded the first statement was a "golden rule" argument.  Such an argument "asks the jurors to put themselves in the place of a party or victim.  Courts frown upon this type of appeal to the emotions or personal interests of the jurors."  *Snipes v. Am. Family Mut. Ins. Co.*, No. 19-0292, 2020 WL 1307865, at *2 (Iowa Ct. App. Mar. 18, 2020).  We find no abuse of discretion in the district court's assessment.  Counsel primed the jury to place themselves in Kipp's position by asking them a number of hypothetical questions about how they value their own experiences and about what "the most valuable thing to us" is.

Having concluded several of plaintiff's counsel's statements during closing and rebuttal arguments were improper, we must next determine whether the statements were prejudicial.  *See Yeager v. Durflinger*, 280 N.W.2d 1, 8 (Iowa 1979) ("Before a new trial will be granted, it must appear that prejudice resulted or that a different result could have probable but for any misconduct.").  To do so, we consider several factors, including "the severity and pervasiveness of the misconduct, the significance of the misconduct to the central issues in the case, the strength of the State's evidence, the use of cautionary instructions or other curative measures, and the extent to which the defense invited the improper conduct."  *State v. Ayabarreno*, No. 13-0582, 2014 WL 465761, at *4 (Iowa Ct. App. Feb. 4, 2014) (citing *State v. Graves*, 668 N.W.2d 860, 869 (Iowa 2003)); *see also Bronner v. Reicks Farms, Inc.*, No. 17-0137, 2018 WL 2731618, at *7 (Iowa Ct. App. June 6, 2018) (applying the factors to civil cases).  And we consider the

---

an improper attack on the court's instruction, we do not address this issue on appeal.

cumulative effect of counsel's improper statements. *See Kinseth*, 913 N.W.2d at 73.

On our review of the closing arguments in their entirety, the district court did not abuse its discretion in concluding it is likely a different result would have occurred but for plaintiff's counsel's improper arguments. Many of the complained-of statements—counsel's references to "accountability," counsel's references to Stanford's refusal to take responsibility and "betrayal," and counsel's emphasis on community and the social consequences of the verdict to the individual jurors—were not "isolated missteps." *Id.* at 73. Instead, they were "part of a theme for closing arguments that is premised on improper jury considerations." *Id.* Plaintiff's counsel made the improper statements throughout closing and rebuttal arguments, and likely influenced the jury's liability determination, which the district court characterized as "the central and primarily disputed issue" in the case. While the district court gave a curative instruction following plaintiff's counsel's closing argument, counsel refocused the jury's attention on the accountability, responsibility, and community themes in rebuttal. Defense counsel had no opportunity to respond to counsel's rebuttal statements, and those statements were fresh in the jury's mind when it began deliberations.

## IV. Conclusion

Under these circumstances and in view of the significant deference given to the district court, we cannot say the district court abused its discretion in determining plaintiff's counsel's statements were improper, and we cannot say the

district court's prejudice determination rested on clearly untenable or unreasonable grounds.

**AFFIRMED.**